**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **MARTIN CAUSEY,** | |
| *Plaintiff,* | |
| **v.** | **CIVIL ACTION NO.** |
| | **5:17-cv-00173-TES** |
| **SHERIFF DAVID DAVIS,** *et al.,* | |
| *Defendants.* | |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

As the old proverb goes, "there are two sides to every story." But when it comes to litigation, there might just be three: a plaintiff's, a defendant's, and then whatever version the jury ultimately believes. Sometimes, the difference between the parties' versions is just too broad for summary judgment to be appropriate. In that case, the only story the Court can ultimately accept must come from a jury. Such is the case today as to several of Plaintiff Marvin Causey's claims.

This case has a prolonged, complicated, and convoluted procedural history, so the Court will begin at its genesis in 2015. The case arose after Plaintiff's arrest during an encounter with the Defendant law-enforcement officers at a Quick Serve gas station in Macon on January 25, 2015. *See* [Doc. 54, ¶¶ 9, 17, 19]. Following discovery, some of

the Defendants filed a Motion for Summary Judgment on June 25, 2018. [Doc. 33]. But then, on October 31, 2018, while the Defendants' Motion was still pending, this Court entered an Order dismissing Plaintiff's state-law claims and staying all federal claims until the conclusion of the criminal proceedings against Plaintiff. [Doc. 48]. The Court administratively closed the action because the local district attorney had dead-docketed the criminal charges against Plaintiff. *See* [Doc. 48, p. 7].

Fast forward five years, and on July 10, 2023, the Superior Court of Bibb County entered an Order lifting the underlying criminal case from the dead docket and nolle prossing it. [Doc. 49, p. 2]. Consequently, Plaintiff moved to reopen this civil action [Doc. 49], which the Court granted. [Doc. 50]. However, when the Court turned to review the Defendants' then-pending Motion for Summary Judgment from October 2018, it noticed several severe deficiencies in Plaintiff's Original Complaint [Doc. 1-1] and ordered him to amend by February 21, 2024. [Doc. 51, pp. 8–11]. Plaintiff did so. *See* [Doc. 54].

In his Amended Complaint, Plaintiff brings several state-law claims against Officers John Campbell, Jeffery Prestridge, Alex Fletcher, Theodore Gaines, Daniel Mattox, and Bradford Lee Mock (collectively, "Present Defendants"), including negligence (Count VII), assault and battery (Count VIII), false arrest (Count IX), false imprisonment (also Count IX), malicious prosecution (also Count IX), and intentional infliction of emotional distress (also Count IX). Plaintiff's federal claims against the

Present Defendants include conspiracy to deprive rights under 42 U.S.C. § 1985 (Count III), violation of a duty to intervene under 42 U.S.C. § 1986 (Count IV), and several claims under 42 U.S.C. § 1983, including claims for excessive force against Campbell only for shooting Plaintiff (Count I); false arrest against Campbell only (Count II); excessive force against all Present Defendants for beating him after he was shot, subdued, and then handcuffed (Count V); and failure to provide prompt medical care against all Present Defendants (Count X). Plaintiff brings a separate § 1983 claim against Sheriff David Davis on a supervisory-liability theory (Count VI). Finally, Plaintiff asks for punitive damages as to his claims against the Present Defendants (Count XI).

Defendants answered and later filed their Amended Motion for Summary Judgment, which is now at issue.[1] [Doc. 57]; [Doc. 58]; [Doc. 62]. For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' Amended Motion for Summary Judgment [Doc. 62]. As there is no dispute of material fact as to any claim against Sheriff Davis (Count VI), the Court **DISMISSES** the claims against him **with prejudice**. Additionally, the Court **DISMISSES with prejudice** several of Plaintiff's claims against the Present Defendants: (1) Plaintiff's § 1983 false-arrest claim against Campbell (Count II); (2) his state-law negligence claim against all Present

---

[1] Defendants filed their new Motion for Summary Judgment on April 22, 2024, but refiled it the next day, this time including various attachments, such as their Statement of Material Facts and the affidavits from each of the Defendants. *See* [Doc. 61]; [Doc. 62]. The Court previously denied as moot Defendants' earlier-filed Motion for Summary Judgment [Doc. 61] and, for purposes of this Order, will rule on their Amended Motion for Summary Judgment [Doc. 62]. *See* [Doc. 67].

Defendants (Count VII); (3) his state-law malicious-prosecution, false-imprisonment, and false-arrest claims against all Present Defendants (Count IX)[2]; and (4) his § 1983 failure-to-provide-prompt-medical-care claim against all Present Defendants (Count X). The remainder of Plaintiff's claims, however, must proceed to trial.[3]

## SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." *Landolfi v. City of Melbourne*, 515 F. App'x 832, 834 (11th Cir. 2013) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)). As to issues for which the non-movant would bear the burden of proof at trial, the movant may (1) simply point out an absence of evidence to support the non-moving

---

[2] In Count IX, Plaintiff also asserts intentional infliction of emotional distress (IIED) against the Present Defendants. The IIED claim, as the Court will explain further below, will proceed to trial, so only part of Count IX—the malicious-prosecution, false-arrest, and false-imprisonment claims—is dismissed.

[3] In their Amended Motion for Summary Judgment, Defendants do not argue that the Court should dismiss Plaintiff's 42 U.S.C. § 1986 duty-to-intervene claim (Count IV), so that claim will proceed to trial. *See generally* [Doc. 62-1].

party's case or (2) provide "affirmative evidence demonstrating that the [non-movant] will be unable to prove its case at trial." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant satisfies its burden, the burden shifts to the non-movant, who must "go beyond the pleadings and present *affirmative evidence* to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17) (emphasis added). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the [non-moving] party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)). Finally, and importantly in this case, the Court must view the evidence and draw all reasonable inferences in the light most favorable to the non-movant—here, Plaintiff Causey. *See United States v. Flanders*, 752 F.3d 1317, 1330 (11th Cir. 2014).

## FACTUAL BACKGROUND

### A.  Defendants' Version of the Story

The following events occurred over the course of mere minutes.[4] [Doc. 62-8, Gaines Aff., ¶ 10]. In the early hours of January 25, 2015, Sergeant John Campbell of the Bibb County Sheriff's Office ("BSCO") Patrol Division and his squad were working an

---

[4] Deputy Theodore Gaines stated in his affidavit that the precinct office was so close to the location of the incident that it only took "a minute or so" for him and the other deputies to arrive at the scene. [Doc. 62-8, Gaines Aff., ¶ 10].

overnight shift, conducting business checks.[5] [Doc. 62-4, Campbell Aff., ¶¶ 8–9]. As 3

a.m. approached, Campbell was driving by the Quick Serve gas station on Mercer

University Drive when he saw a pile of debris on the ground that he had not seen there

earlier that same night. [*Id.* at ¶¶ 10–11]. Because of the total darkness both inside and

outside the building, Campbell shined his headlights on the debris and saw that the

exterior door to the cooler on the east side of the gas station was torn off the hasp, and

beer bottles were lying on the ground. [*Id.* at ¶¶ 11–12]; [Doc. 62-5, Prestridge Aff., ¶ 7].

Between approximately 2:55 a.m. to 2:58 a.m., he radioed to dispatch for backup, stating

that a burglary was "in progress." [Doc. 62-7, Fletcher Aff., ¶ 7]; [Doc. 62-5, Prestridge

Aff., ¶ 7]. At this point, Campbell didn't know whether someone was in the building

and assumed that someone had burglarized the store and run away. [Doc. 62-4,

Campbell Aff., ¶¶ 11–12]. As he neared the door, he saw a large athletic bag full of beers

and thought for a moment that the perpetrator must have left it too. [*Id.*].

Deputy Prestridge was the first from Campbell's squad to arrive. [Doc. 62-4,

Campbell Aff., ¶ 13]. As soon as he arrived, Campbell opened the exterior door to the

cooler room, pulled out his gun, and stepped inside the unlit building to clear it. [*Id.*];

[Doc. 62-5, Prestridge Aff., ¶ 7]. From what the Court can make of the somewhat cloudy

facts, it appears that Campbell was standing in the cooler area behind the glass doors

---

[5] Sheriff Davis was not present at the scene at any point for the events of the January 25, 2015, incident.
[Doc. 62-3, Davis Aff., ¶ 21].

from which customers would ordinarily grab a drink when he noticed that someone had ransacked the place, tearing out the shelving inside the cooler room such that it opened to the entire store. *See* [Doc. 62-4, Campbell Aff., ¶¶ 13–14, 17].

Standing in the midst of darkness, the only light being the faint light shining dimly through the half-covered windows, Campbell all of a sudden heard a loud noise. [*Id*. at ¶¶ 13–14]. His eyes searched for its source and saw a large man trying to kick out the Plexiglas on the other side of the store. [*Id*. at ¶14]. Campbell yelled for Deputy Prestridge to go around the west side of the building and catch the suspect if he broke through. [*Id*.]. The man (Plaintiff) began moving low from aisle to aisle, hiding. [Doc. 62-5, Prestridge Aff., ¶ 7]. Not knowing whether he was armed or whether there was more than one person in the dark store, Prestridge radioed for more backup. [*Id*. at ¶ 8]; [Doc. 62-8, Gaines Aff., ¶ 9]. With his gun in one hand and a flashlight in the other, Campbell identified himself as police and yelled at Plaintiff to stand up and put his hands above his head. [Doc. 62-4, Campbell Aff., ¶ 16]. Plaintiff stood up, smirking in the light of Campbell's flashlight in a way that "gave [Campbell] the creeps." [*Id*.]. Campbell ordered Plaintiff again to put his hands above his head, but Plaintiff only lifted one.[6] [*Id*.]. Campbell shouted at Plaintiff multiple times to lift the other, but Plaintiff refused and instead began moving slowly toward the middle of the store,

---

[6] Throughout this entire encounter, Campbell still had no idea whether Plaintiff had a gun. [Doc. 62-4, Campbell Aff., ¶ 27].

moving toward Campbell.[7] [*Id*.]. Campbell was only able to see the top of Plaintiff's head as he moved down the aisle. [*Id*. at ¶ 15]. Seeing Plaintiff's slow movement through the window, Deputy Prestridge ran back around to the east side of the store, and in that short time, a saga unfolded. *See* [Doc. 62-5, Prestridge Aff., ¶ 8].

Plaintiff reached the end of the merchandise aisle, dropped his hand, charged toward the open glass door where Campbell was standing, pushed the door into Campbell, pinning Campbell between the glass door and its metal doorframe. [Doc. 62-4, Campbell Aff., ¶¶ 16–17]. Fearing that Plaintiff could get ahold of his gun and remembering his training, Campbell kept his hand holding his gun almost behind him, fighting Plaintiff off with the one arm that was still holding the flashlight. [*Id*.]. Campbell tried to push Plaintiff off him, but because of Plaintiff's large stocky build, Campbell couldn't control him. [*Id*.]. Campbell started falling towards the floor, and, afraid that Plaintiff could get on top of him and take his gun, he pulled his gun toward his hip and fired four or five times. [*Id*. at ¶¶ 17–18]. At this moment, he saw Plaintiff's face. [*Id*. at ¶ 18].

Hearing the gunshots as he was running around the building, not knowing who had fired them, Prestridge shouted over the radio, "I got gunfire!" followed by "Signal 64," which indicates a life-or-death situation or an officer down, as well as, "Send 48,"

---

[7] Campbell testified in his affidavit that he neither used profanity or racially charged language nor threatened to kill Plaintiff. [*Id*. at ¶ 28].

which means to send an ambulance. [Doc. 62-6, Mattox Aff., ¶ 10]; [Doc. 62-7, Fletcher Aff., ¶ 8]; *see* [Doc. 62-3, Davis Aff., ¶ 15]; [Doc. 38, Mock Depo., pp. 41:18–44:23].

When Deputy Prestridge reached the east side of the building, he saw Plaintiff lying there face-down in a Checkers uniform, a black beanie, and a heavy jacket, with his hands under his waist. [Doc. 62-5, Prestridge Aff., ¶ 8]. Prestridge was about to handcuff Plaintiff when he saw Campbell on the ground three or four feet from Plaintiff, with Plaintiff blocking the doorway. [*Id*.]; *see* [Doc. 62-4, Campbell Aff., ¶¶ 18–19]. Not knowing whether Campbell was shot, Prestridge tried to pull Plaintiff out of the way to check on Campbell, but Plaintiff tried to stand up. [Doc. 62-5, Prestridge Aff., ¶ 9]. Also not knowing whether Plaintiff was armed, Prestridge yelled at Plaintiff, trying to wrestle Plaintiff's hands out from under his waist and keep him pinned down.[8] [*Id*. at ¶ 10]. Plaintiff kept trying to stand up, so Prestridge—unable to maneuver the suspect into handcuffs on his own—put his foot in Plaintiff's upper back while waiting for backup to arrive. [*Id*.]. At some point, Plaintiff told Prestridge that he had been shot, and Prestridge immediately called an ambulance, which arrived minutes later. [*Id*. at ¶ 11]. Prestridge had his taser out but holstered it when the other deputies arrived. [Doc. 62-7, Fletcher Aff., ¶ 9].

Within minutes of the first radio call and within seconds of each other, the other

---

[8] The other deputies who were on their way to the scene could hear Prestridge yelling over the radio ordering the suspect to get on the ground. [Doc. 62-8, Gaines Aff., ¶ 11].

officers began arriving, each unsure about who had been shot—the suspect or their sergeant—and tensions were high. [*Id*. at ¶¶ 9–10]; [Doc. 38, Mock Depo., pp. 40:25–41:15]. Campbell was still laying down on the ground, and some of the deputies, particularly Deputy Mock, thought Sergeant Campbell had definitely been shot. *See* [Doc. 62-6, Mattox Aff., ¶ 16]; [Doc. 38, Mock Depo., pp. 47:11-25, 53:2-10, 59:17–60:15]. When Deputy Alex Fletcher asked Campbell if he had been shot, Campbell seemed unsure. [Doc. 62-7, Fletcher Aff., ¶ 10].

The deputies struggled to get handcuffs on Plaintiff as he "kick[ed] like hell," yelled and screamed, and kept his arms locked under him. [Doc. 62-6, Mattox Aff., ¶ 12]. Plaintiff had huge arms, made thicker by his thick winter coat, which made it even more difficult for the officers to gain control of him. [Doc. 62-8, Gaines Aff., ¶ 12]; [Doc. 38, Mock Depo., p. 52:2-10]. Campbell, who was still on the ground, tried to stand up, grunting in pain, and said something about someone being shot. [Doc. 62-8, Gaines Aff., ¶ 13].

The order of the following events in that short time span is unclear. At some point, Deputy Mattox got on top of Plaintiff's legs to stop the kicking and then saw the gunshot wound to his buttocks, near the top of his hip.[9] [Doc. 62-6, Mattox Aff., ¶¶ 12–13]. It was bleeding but not profusely and was not stopping him from kicking and

---

[9] Mattox was not aware of a second gunshot wound until later interviewed by an attorney about this lawsuit. [Doc. 62-6, Mattox Aff., ¶ 15].

fighting and keeping his arms locked under him. [*Id*.]. Deputy Gaines fired his taser in

stun mode.[10] Deputy Mock—who suffers from PTSD from his time in the military—was

very upset, cursing and yelling. [*Id*. at ¶ 16]; [Doc. 38, Mock Depo., pp. 82:25–83:6]. He

went up by Plaintiff's head, grabbed his shoulder and shook him, asking (more like

yelling) why he shot Sergeant Campbell, and punching him two or three times in the

shoulder. [Doc. 62-7, ¶ 11]; [Doc. 38, Mock Depo., p. 55:16-21]. He stated in his

deposition that, "There for a few minutes, I wasn't in Macon, Georgia. I was in the

combat field." [Doc. 38, Mock Depo., p. 56:2-18].[11] Mock stated that he was unsure

whether he hit Plaintiff after he was cuffed, but Deputy Mattox stated in his affidavit

that Mock calmed down and walked away when Mattox informed him that Campbell

was fine. *See* [*id*. at p. 62:2-7]; [Doc. 62-6, Mattox Aff., ¶ 16].

When one of the officers finally got the handcuffs on Plaintiff, one of them yelled,

"Cleared!" and they all stood up and backed away. [Doc. 62-6, Mattox Aff., ¶ 13]; [Doc.

---

[10] Gaines did not recall doing so but stated in his affidavit that if he did so, it was to gain control of the suspect. [Doc. 62-8, Gaines Aff., ¶ 20].

[11] While Defendants did not refile Deputy Mock's deposition [Doc. 38] to support the instant Amended Motion for Summary Judgment as they did the other officers' affidavits, they do allude to it in their Motion, albeit without citing to it. *See* [Doc. 62-1, p. 25 n.16 ("Defendant Mock truthfully admitted to BCSO Internal Affairs investigators, the GBI's investigator, *and in his deposition* in this case that he struck Plaintiff after Plaintiff had been secured with handcuffs.") (emphasis added)]. Because this admission is materially important to Plaintiff's claims, because Defendants allude to it in their Motion, and finally, because the Court has the authority to do so, the Court will consider it when ruling on Defendants' Amended Motion. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

62-7, Fletcher Aff., ¶ 12].[12] At some point, Plaintiff said he couldn't breathe, so Campbell, Prestridge, and another officer rolled him on his side. [Doc. 62-4, Campbell Aff., ¶ 20]; [Doc. 62-5, Prestridge Aff., ¶ 12]. The ambulance was two minutes away. [Doc. 62-4, Campbell Aff., ¶ 20]. Plaintiff was still trying to stand up, saying he was hurting, but Deputy Mattox advised him that it was best to stay where he was, and that the ambulance was on its way. [Doc. 62-6, Mattox Aff., ¶ 15].

Both Plaintiff and Sergeant Campbell were transferred by ambulance for medical treatment, with Plaintiff going in the first ambulance to arrive. [Doc. 62-5, Prestridge Aff., ¶ 12]; [Doc. 62-4, Campbell Aff., ¶ 21]. It was less than ten minutes between Sergeant Campbell's first radio dispatch and the ambulance arriving at the scene. [Doc. 62-6, Mattox Aff., ¶ 17].

**B.  Plaintiff's Version of the Story**

But, as alluded to above, Plaintiff tells quite a different story.

It begins earlier in the night when Plaintiff got off his shift at the Checkers down the street from the Quick Serve around 10 or 11 p.m. [Doc. 64, Causey Depo., pp. 55:18–56:8, 69:4-8]. On his usual walk home, he was receiving repeated unwanted phone calls

---

[12] At this point, Sergeant Campbell had stood up and was leaning against an ice machine. [Doc. 62-4, Campbell Aff., ¶¶ 18–20]. Although he still felt dizzy, he recalls seeing Plaintiff in handcuffs and the other officers standing away from Plaintiff. [*Id*.].

from a woman named Samantha when he decided to pay a visit to his friend "'migo,"[13] who ran the Quick Serve gas station down the street. [*Id*. at pp. 56:9–57:3, 71:9–72:7]. Plaintiff saw someone standing by the cooler door on the side of the gas station who he assumed was 'migo, said hello from afar, and then went home to his wife.[14] [*Id*. at pp. 57:16–58:2, 72:7–73:20]. He talked to the Samantha during his walk home—45 minutes to an hour—but then told her to stop calling him because he was a married man. [*Id*. at pp. 79:17–80:11].

When Plaintiff finally got home, he realized he left his speaker box for playing music at work, so he went back to retrieve it. [*Id*. at p. 58:1-18]. Samantha called him again, and he once more told her to stop calling. [*Id*. at pp. 58:19–59:3]. On his way back from this second trip of the night to Checkers, he stopped by the gas station again to say hello to 'migo when suddenly, he noticed something was amiss. [*Id*. at p. 59:4-16]. The cooler door on the side of the building where he had seen 'migo earlier in the night, was wide open, and there was something lying on the ground. [*Id*.]. He thought it was 'migo's leg or body. [*Id*. at pp. 59:4–60:1, 87:12-20]. Concerned for his friend, he walked

---

[13] The record contains no indication as to the proper identity of this individual. Plaintiff refers to him only as "'migo" throughout his deposition, and the deposition transcript uses a lowercase "m." *See, e.g.*, [Doc. 64, Causey Depo., pp. 56:12-13, 57:19, 59:7, 71:17-20]. Accordingly, to keep it consistent, the Court will likewise refer to him that way, despite the improper spelling.

[14] It is unclear whether Plaintiff is saying there was more than one person standing there, one of whom Plaintiff assumed was 'migo, or if he only saw one person. *See* [Doc. 64, Causey Depo., pp. 57:19-25, 72:7-11–74:3 (saying at one point that there "was like four of them over like at the freezer part" but then, upon the deposing attorney asking how many people he saw, stating that "there's no more than one person")].

over, but as it turned out, it was just a trash bag. [*Id.* at pp. 59:17–60:15, 97:2-20]. Peaking inside the freezer door, Plaintiff saw all the merchandise thrown about and decided to step inside. [*Id.* at p. 91:1-15]. He was there only four or five minutes when Sergeant Campbell arrived. [*Id.* at pp. 93:25–94:9].

With at least one hand up, Plaintiff tried to calmly explain the situation to Sergeant Campbell—that he was not burglarizing the place and was only in there out of concern for his friend 'migo—but Campbell was angry and aggressive. [*Id.* at pp. 60:16–61:21, 190:1-17]. Plaintiff stated in his deposition that he had his "hand" (singular) up.[15] [*Id.* at p. 60:21]. Plaintiff was afraid to put his "hand" (singular) down and have the officer think he had a weapon, so he "kept them up" (plural). [*Id.* at p. 60:21-22]. Campbell was unwilling to listen: Using profane language and yelling, he told Plaintiff to shut up and instructed the other officer (Deputy Prestridge) to go around the other side of the building and "shoot his ass" if Plaintiff came out on that side. [*Id.* at pp. 60:23–62:1, 94:9-22]. Terrified that Campbell would shoot him regardless of what he did, Plaintiff ducked under the shelf, still with his "hand" (singular) up.[16] [*Id.* at p. 61:15-21].

Campbell said to Prestridge, "I got him trapped in here. You just hold up." [*Id.* at

---

[15] It is unclear whether Plaintiff meant to say that he only had one hand up or whether the transcript merely mistranslates his testimony. For example, sometimes Plaintiff says "hand" followed by the singular "is" or "it," but at other points, he says, "them" (obviously referring to both hands) and "[b]oth of them." *See* [*id.* at pp. 60:20-22, 61:5-21, 62:5-24, 94:22–95:24, 101:9, 102:12-14, 184:15-19].

[16] At one point in the deposition, Plaintiff was directly asked whether he had one or both hands up, and he replied, "Both of them." *See* [*id.* at p. 102:12-14].

p. 62:12-14]. And then Campbell said, "I'm going to blow your head off in here." [*Id.* at pp. 62:25–63:1]. Fearing for his life, Plaintiff knew he needed to get out of there, but the only unlocked and unblocked exit was the cooler door through which he and Campbell had both entered. *See* [*id.* at pp. 63:1-11, 181:9–83:15, 185:17-20, 188:12-17]. Plaintiff then heard Campbell's feet tapping against the floor and assumed he was on the move. [*Id.* at p. 195:5-17]. Plaintiff counted 12 steps and thought that 12 steps would render Campbell far enough away from the door to be out of the way for Plaintiff to escape.[17] [*Id.*]. So, still in his ducking position, Plaintiff ran toward the door, and by the time he got there, Campbell had fired, and Plaintiff fell by the freezer door—shot in the back, while fleeing. [*Id.* at pp. 63:8-21, 188:9-24].

Because he was shot in the back, Plaintiff maintains that he could not have been charging *at* Defendant Campbell. [*Id.* at p. 103:2-8]. Moreover, Campbell was on an aisle to the right of the aisle Plaintiff was on. [*Id.* at p. 185:14-16]. The door to the cooler room swings open to the left, so Plaintiff could not have hit Campbell with the door. [*Id.* at p. 187:15-22]. Plaintiff maintains that Campbell had "moved from that door." [*Id.* at pp. 185:3, 188:16-17].

Before he knew it, Plaintiff found himself laying stretched out on his face with

---

[17] Causey stated in his deposition that Campbell intentionally made it sound like his feet were moving so that Causey would try to run at the door and Campbell could shoot him, but clearly, Plaintiff cannot testify as to Defendant Campbell's intent. *See* [*id.* at pp. 194:12-24]; Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

his arms under his head. [*Id*. at pp. 63:20–64:9]. Running around from the other side of the building, Prestridge said, "You shot my partner," to which Plaintiff replied, "I ain't shoot nobody. I was shot." [*Id*. at pp. 64:10-25, 104:9-19]. But Prestridge didn't listen and instead started stomping and kicking Plaintiff. [*Id*.]. Poking the gun in Plaintiff's face, Prestridge said, "I should blow your brains out." [*Id*.].

Without handcuffing Plaintiff, Prestridge went into the gas station. [*Id*. at pp. 65:9-15, 104:19-20]. Together, the two officers came out of the building, and as Plaintiff prayed to God to not let him die, "they" stomped on him.[18] [*Id*. at pp. 65:17–66:14]. Despite that Plaintiff was not kicking, the officers kept saying that he was trying to resist arrest. [*Id*. at pp. 113:14–114:10]. Although the officers later found a box cutter on Plaintiff's person (which he used at work), Plaintiff never took it out of his pocket nor even reached for it. [*Id*. at pp. 126:21–127:19]. With Plaintiff's arms locked under his head, the officers (now joined by the rest of the Present Defendants) handcuffed him and continued to kick him.[19] [*Id*. at p. 66:5-24]. One officer said, "Man, y'all already got this man handcuffed and the man shot, but y'all called it in and said the officer was shot – the officer was shot." [*Id*. at pp. 66:5-24, 106:17-22]. And yet, at least one officer

---

[18] From the transcript of Plaintiff's deposition, it is unclear whether "they" includes Campbell or just Prestridge and the other officers who soon after arrived on the scene. *See* [Doc. 64, Causey Depo., p. 65:19-21]. However, giving Plaintiff the benefit of the doubt and making all reasonable inferences in his favor, the Court will construe "they" to include Campbell for purposes of ruling on this Motion. *See Flanders*, 752 F.3d at 1330.

[19] Because he was slipping in and out of consciousness, Causey is unsure of how many officers continued to beat him after they got him handcuffed. [Doc. 64, Causey Depo., p. 105:18-23].

continued to kick him. [*Id*.]. Another officer had to fight that officer off Plaintiff and shove him against the building to get him to stop kicking Plaintiff. [*Id*.]. At some point, one officer tazed Plaintiff on his rear end where he got shot, and his body convulsed, blood rushing out of him. [*Id*. at p. 112:3-18].

Plaintiff pleaded with the officers and told them he couldn't breathe, so they turned him on his side. [*Id*. at p. 166:9-21]. At that point, he heard someone use the "N" word.[20] [*Id*. at pp. 167:5–168:16]. It took 30 more minutes after that for the ambulance to arrive. [*Id*. at p. 116:19-24].

C. **GBI Investigation and Police Department Policies**

When an officer is involved in a shooting, Sheriff Davis's normal practice is to request that the Georgia Bureau of Investigations ("GBI") conduct a criminal investigation, rather allowing the Criminal Investigation Division of his own department do it. [Doc. 62-3, Davis Aff., ¶ 6]. In accordance with that practice, after the January 25, 2015, shooting, Sheriff Davis notified the GBI, which then conducted an investigation. [*Id*. at ¶ 7]. On February 5, 2016, the District Attorney informed Sheriff Davis that Campbell had been cleared of any wrongdoing. [*Id*. at ¶ 9]. Sheriff Davis also directed that the matter be investigated by the BSCO Internal Affairs Division to

---

[20] It is unclear who Plaintiff is claiming said the "N" word—whether one of the officers or a passerby. The deposing attorney seems to imply that the person who used the "N" word might have been Jonathan Harris, a man who watched and recorded part of the incident and approached the officers as they were handcuffing Plaintiff. *See* [*id*. at pp. 167:5–169:23]. However, making all reasonable inferences in favor of Plaintiff, it seems that Plaintiff maintains that it was "the other officer." *See* [*id*. at p. 168:15-16]; *see Flanders*, 752 F.3d at 1330.

determine whether Campbell violated any internal policies. [*Id.* at ¶ 8].

## DISCUSSION

Because of the discrepancy in accounts, it appears that we have a problem in this case that summary judgment is ill equipped to answer as to at least a few claims against the Present Defendants. There are two versions of what happened in the early hours of January 25, 2015, at that QuickServe gas station. Under Defendants' version of the story, the Present Defendants would well be entitled to official and qualified immunity and therefore, summary judgment on all of Plaintiff's claims. Plaintiff's version, however, paints quite a different picture.

Unanswered questions remain: Did Plaintiff have one hand up or both? Was Plaintiff fleeing from Defendant Campbell when Campbell shot him, or was he charging at Campbell? Were both of his hands handcuffed while the Defendant officers beat and tazed him, or was Plaintiff resisting with one hand hidden under his body, refusing to be handcuffed? Because the answers to these questions would determine whether the Defendant officers' uses of force were justified, the answers are material to Plaintiff's claims for excessive force (Counts I and V), conspiracy (Count III), duty to intervene (Count IV),[21] assault and battery (Count VIII), and as a byproduct, whether Plaintiff can obtain punitive damages (Count XI).

---

[21] Again, Defendants do not dispute that Plaintiff has a duty-to-intervene claim. *See generally* [Doc. 62-1]; *see supra* note 3.

The Court cannot answer these questions because the Court doesn't find facts at summary judgment. That task is reserved for a jury, and they will have to make those decisions. The Court is certainly not saying Plaintiff will carry the day. But only a jury can sit in judgment of the facts and determine what really happened. The Court now addresses each of Plaintiff's claims in turn.

### A. Plaintiff's State-Law Claims

#### 1. Assault and Battery

Plaintiff brings an assault-and-battery claim against each of the Present Defendants (Count VIII). In particular, he alleges that Campbell assaulted him by threatening to shoot—and then actually shooting—him, and Prestridge assaulted him by holding a gun to his head. [Doc. 54, ¶¶ 88–89]; *see* [Doc. 64, Causey Depo., pp. 62:25–63:21, 64:10-25, 104:9-19, 188:9-24 (Causey testifying as to the same)]. Further, he alleges that each of the present Defendants—including Campbell and Prestridge—beat and kicked him after he had been shot and both before and after he had been handcuffed. [Doc. 54, ¶¶ 90–91]; *see* [*id*. at pp. 66:5-24, 106:17-22 (Causey testifying as to the same)].

For state-law claims like assault and battery, "[i]t is well settled that an officer performing a discretionary act is entitled to official immunity unless he or she 'acted with actual malice or with actual intent to cause injury.'" *Outlaw v. Nasworthy*, 551 S.E.2d 785, 788 (Ga. Ct. App. 2001). Decisions that involve "deliberation and judgment," such as "whether to arrest a person, the proper amount of force to use to effect that

arrest, and the method in which medical care would be administered to a person in

custody," are ordinarily taken pursuant to a police officer's duty and within the scope

of their authority and are, therefore, discretionary acts. *Todd v. Kelly*, 535 S.E.2d 540, 542

(Ga. Ct. App. 2000); *Kinlocke v. Benton*, 257 F. Supp. 3d 1368, 1378 (N.D. Ga. 2017).

Neither party here disputes that the Present Defendants acted within their discretionary

authority in using force to apprehend Plaintiff. *See* [Doc. 68, p. 10 (Plaintiff admitting

that "Defendants were acting within their discretionary authority toward Plaintiff")].

Rather, Plaintiff only disputes that the Present Defendants behaved with actual malice,

thus defeating official immunity. *See* [*id.*].

In the context of official immunity, "the term 'actual malice' . . . denote[s]

'express malice or malice in fact.'" *Merrow v. Hawkins,* 467 S.E.2d 336, 338 (Ga. 1996)

(quoting *Black's Law Dictionary*, 6th ed. (1990)). "The phrase actual intent to cause injury

has been defined in a tort context to mean an actual intent to cause harm to the plaintiff,

not merely an intent to do the act purportedly resulting in the claimed injury." *DeKalb*

*Cnty. v. Bailey*, 736 S.E.2d 121, 126 (Ga. Ct. App. 2012). For example, the court in *Bailey*

held that a police officer was not entitled to official immunity because he was not

justified in shooting the suspect, who was running away from him. *Id*. Likewise, the

Eleventh Circuit has denied qualified immunity to police officers "who arrested [a]

plaintiff for disorderly conduct, placed him in handcuffs, and then, *after he had been fully*

*secured*, slammed his head into the pavement and kicked him in the leg, head, and

back." *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002) (emphasis added) (discussing *Slicker v. Jackson*, 215 F.3d 1225, 1227 (11th Cir. 2000)).

Although Georgia courts have expressed that official immunity is important where police officers "must make a split second decision," the doctrine "does not provide blanket protection for all shootings by law enforcement officers." *Collins v. Schantz*, 893 S.E.2d 185, 188 (Ga. Ct. App. 2023). "There are limits." *Id*. The question of whether official immunity protects the Defendant police officers from Plaintiff's state-law assault and battery claims, therefore, turns on whether the shooting and alleged subsequent beatings and tasing were justified. *See id*.

Unfortunately for the Present Defendants, there are two competing factual narratives on his point, rendering summary judgment impermissible on this claim. For the claims against Defendant Campbell, did Plaintiff charge at Campbell, or was the Plaintiff fleeing with his hands up? *Compare* [Doc. 62-4, Campbell Aff., ¶¶ 15–17], *with* [Doc. 64, Causey Depo., pp. 61:5–63:17]. Then, were he and the later-arriving police officers trying to handcuff a resisting suspect with a hand hidden under him, or were Plaintiff's hands visible above his head? *Compare* [Doc. 62-6, Mattox Aff., ¶¶ 12–13], *with* [Doc. 64, pp. 65:19–66:24]. Did the officers continue to beat Plaintiff once he was already handcuffed, or did they all step away once the handcuffs were on? *Compare* [Doc. 62-6, Mattox Aff., ¶¶ 12–13], *and* [Doc. 62-7, Fletcher Aff., ¶ 12], *and* [Doc. 38, Mock Depo., p. 62:2-7], *with* [Doc. 64, Causey Depo., pp. 65:19–66:24, 106:13-24].

The Present Defendants argue that their uses of force against Plaintiff, even in shooting him, were warranted and permissible under state law. [Doc. 62-1, p. 22]. And, they would be right if the Court accepted their version of facts—the one thing the Court cannot do. *See Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when] ruling on a motion for summary judgment."); *Porter v. Massarelli*, 692 S.E.2d 722, 726 (Ga. Ct. App. 2010) (holding that the trial court erred in granting summary judgment on the basis of official and qualified immunity when there was a genuine dispute as to whether the officer's shooting was justified). Because a jury must decide these factual questions, the Court therefore **DENIES** the Defendants' Motion for Summary Judgment [Doc. 62] on Plaintiff's claim for assault and battery (Count VIII).

2. <u>Negligence</u>

Next, Plaintiff asserts that the Present Defendants "had a duty to follow the law," "their oaths of office" and "department policy guidelines" and that they breached this duty "by threatening, shooting, detaining, beating, tazing, restraining, beating (again), and tazing Plaintiff (in that order)." [Doc. 54, ¶¶ 84–86]. However, those are the same facts Plaintiff uses to support his excessive-force and assault-and-battery claims. *Compare* [*id*.], *with* [*id*. at ¶¶ 66–74, 88–92]. The Plaintiff fails to explain how a person can "negligently" or "accidently" threaten and beat another person. Because Plaintiff pleads

22

his assault-and-battery claim (Count VIII) in the alternative to his negligence claim, the

Court is inclined to take a page out of Florida law's playbook and only allow a

negligence claim to proceed in conjunction with an excessive-force claim *if* the

negligence claim is based on something other than the use of force. *See Lewis v. City of

St. Petersburg*, 260 F.3d 1260, 1263 (11th Cir. 2001) (citing Florida law to hold that even

though a plaintiff could bring a separate negligence claim against a police officer in

conjunction with a claim for excessive force, "the negligence component must pertain to

something other than the actual application of force during the course of the arrest")

(quoting *City of Miami v. Sanders*, 672 So.2d 46, 48 (Fla. Dist. Ct. App. 1996)).[22]

Accordingly, because Plaintiff cannot base a negligence claim on the same exact

acts as he bases his intentional claims, i.e., his assault-and-battery and excessive-force

claims, the Court **DISMISSES** Plaintiff's state-law negligence claim (Count VII).

### 3.    False Imprisonment, False Arrest, and Malicious Prosecution

The common law tort of malicious prosecution requires that a plaintiff show (1) a

criminal prosecution initiated or continued by the defendant (2) with malice and

without probable cause (3) that terminated in the plaintiff's favor and (4) caused

---

[22] Moreover, as explained above, police officers are entitled to official immunity for discretionary acts—such as attempting to apprehend a suspect—unless they act with "actual malice" or "intent to cause injury." *See Outlaw*, 551 S.E.2d at 788 (Ga. Ct. App. 2001); *see Kinlocke*, 257 F. Supp. 3d at 1378 (N.D. Ga. 2017). However, "nothing in the ordinary definition of negligence shows a deliberate intention to commit a wrongful act" as would demonstrate the actual malice necessary to overcome official immunity under Georgia law. *Farr v. Daling*, 684 F. Supp. 3d 1322, 1339 (N.D. Ga. 2023). So, even assuming Plaintiff could bring a state-law negligence claim based on the same exact acts as his assault-and-battery and excessive-force claims, the Present Defendants would be entitled to official immunity.

damages to the plaintiff. *Wood v. Kessler*, 323 F.3d 872, 882 (11th Cir. 2003) (citing *Uboh v. Reno*, 141 F.3d 1000, 1004 (2003)); *Barnette v. Coastal Hematology & Oncology, P.C.*, 670 S.E.2d 217, 220 (Ga. Ct. App. 2008); *see Condon v. Vickery*, 606 S.E.2d 336, 339 (Ga. Ct. App. 2004) (affirming grant of summary judgment where plaintiff could not prove one element of malicious-prosecution claim). The elements of Georgia's false-arrest claim are (1) the presence of malice and (2) the absence of probable cause. *Simmons v. Mableton Fin. Co.*, 562 S.E.2d 794, 797 (Ga. Ct. App. 2002); O.C.G.A. § 51-7-40. Finally, the elements of a false-imprisonment claim are (1) an arrest, confinement, or detention of a person (2) without probable cause. *Luna-Fraide v. State*, 739 S.E.2d 75, 77 (Ga. Ct. App. 2013). Although the elements for these three causes of action vary to a degree, the question both central and common to all three claims is whether the plaintiff was arrested without probable cause. *See Adams v. Carlisle*, 630 S.E.2d 529, 535–36 (Ga. App. 2006) (holding that the police officers had probable cause to arrest shopping mall patrons for forgery, thereby precluding patrons' claims for malicious prosecution, false arrest, and false imprisonment).

Therefore, the central question that needs answering is whether the officers had probable cause to detain Plaintiff. *See id*. The question of what facts and circumstances amount to probable cause is a pure question of law. O.C.G.A. § 51-7-3.

> The focus in a probable cause inquiry is whether the facts as they appeared at the time of instituting the prosecution were such as to lead a person of ordinary caution to entertain a belief that the accused was guilty of the offense charged. In other words, the question is, not whether

> plaintiff was guilty, but whether defendants had reasonable cause to so
> believe—whether the circumstances were such as to create in the mind
> of defendants a reasonable belief that there was probable cause for the
> arrest and prosecution. Probable cause is defined to be the existence of
> such facts and circumstances as would excite the belief in a reasonable
> mind, that the person charged was guilty of the crime for which he was
> arrested and prosecuted.

*McNeely v. Home Depot, Inc.*, 621 S.E.2d 473, 475 (Ga. Ct. App. 2005) (internal citations

omitted).

In applying the common-law standard for malicious prosecution, the Eleventh

Circuit has held that "[w]here the uncontradicted evidence shows that 'there were some

slight circumstances pointing to his guilt, though not enough to exclude every other

reasonable hypothesis,' there is no claim for malicious prosecution." *Kelly v. Serna*, 87

F.3d 1235, 1241 (11th Cir. 1996) (quoting *El-Amin v. Trust Co. Bank*, 318 S.E.2d 655, 657

(Ga. Ct. App. 1984)). Here, even viewing the evidence in a light most favorable to

Plaintiff (and indeed, even relying on Plaintiff's testimony alone), Plaintiff was

wandering around a dark, closed, ransacked gas station at 3 a.m. *See* [Doc. 64, Causey

Depo, pp. 59:9-16, 70:11-15, 87:12–88:7, 91:1–94:9]. Whatever Plaintiff's true reason for

being in the gas station may be, a police officer finding a person in such a place at such

a time is certainly *at least* a "slight circumstance[] pointing to his guilt." *See Kelly*, 87

F.3d. at 1241. Therefore, as a matter of law, the Court finds that there was probable

cause to detain, arrest, and prosecute Plaintiff. Accordingly, the Court **DISMISSES**

Plaintiff's claims for false arrest, false imprisonment, and malicious prosecution

(contained in Count IX).[23]

### 4. Intentional Infliction of Emotional Distress

In order to prove claim for intentional infliction of emotional distress ("IIED"), a plaintiff is required to show that: (1) the conduct at issue was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the wrongful conduct and the emotional distress; and (4) the resulting emotional distress was severe. *Canziani v. Visiting Nurse Health Sys., Inc.*, 610 S.E.2d 660, 662 (Ga. Ct. App. 2005).

> Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law. Moreover, it has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Id.* at 662 (internal citations omitted). Additionally, Plaintiff would need to defeat official immunity.

In *Title v. Corso*, the Georgia Court of Appeals held that the defendant police officer's alleged threats, use of profanity, and his having "slammed" the plaintiff

---

[23] The Court, however, is not dismissing all of Plaintiff's claims contained in Count IX, which also includes Plaintiff's claim for intentional infliction of emotional distress (IIED). *See infra* Part A.4.

detainee into the hood of his patrol car were insufficient to show actual malice where the police officer was investigating a report of "shots fired." 569 S.E.2d 873, 877–78 (Ga. Ct. App. 2002). Although the "shots fired" turned out to just be a car backfiring, the plaintiff detainee could not pierce the defendant police officer's official immunity for intentional infliction of emotional distress. *Id*. at 877. The court stated that the plaintiff would need to show more than that the officer's actions scared the plaintiff—but rather that the defendant had a "deliberate intent to commit a wrongful act." *Id*.; *see Taylor v. Waldo*, 709 S.E.2d 278, 281 (Ga. Ct. App. 2011) (holding that police officers were entitled to official immunity because there was no evidence of actual malice or intent to injure).

The evidence here, however, presents several factual questions that need answering in order to resolve the dispute as to whether any Defendant was intentionally or maliciously trying to gratuitously injure Plaintiff: (1) whether Defendant Campbell taunted Causey, telling him he was going to shoot him and ordering Deputy Prestridge to shoot him; (2) whether Defendant Campbell shot Plaintiff while Plaintiff was fleeing *from* Campbell or charging *at* Campbell; and (3) whether the officers continued to beat Plaintiff after he was subdued and in handcuffs without any possible justification. *Compare* [Doc. 62-4, Campbell Aff., ¶¶ 15–17], *and* [Doc. 62-6, Mattox Aff., ¶¶ 12–13], *and* [Doc. 62-7, Fletcher Aff., ¶ 12], *and* [Doc. 38, Mock Depo., p. 62:2-7], *with* [Doc. 64, Causey Depo., pp. 61:5–63:17, 65:19–66:24, 106:13-24]. The resolution of that dispute determines whether the Present Defendants acted

with actual malice or intent to injure. *See Taylor*, 709 S.E.2d at 281. Accordingly, there is a genuine issue of material fact that precludes the grant of summary judgment on Plaintiff's claim for IIED (contained in Count IX).

### B. Plaintiff's Federal Claims

The Court will begin with Plaintiff's claims under 42 U.S.C. § 1983. Section 1983 creates no substantive rights. *See Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). Rather, it provides a vehicle through which an individual may seek redress when his federally protected rights have been violated by an individual acting under color of state law. *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994). To state a claim for relief under § 1983, a plaintiff must satisfy two elements. First, he must allege that an act or omission deprived him of a right, privilege, or immunity secured by the United States Constitution or laws of the United States. *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995). Second, he must allege that the act or omission was committed by a state actor or a person acting under color of state law. *Id.*

There also exists another hurdle for Plaintiff. "Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Still, "when a defendant moves for summary judgment based on the doctrine of qualified

immunity, the court must view the facts in the light most favorable to the plaintiff."
*Hardin v. Hayes*, 957 F.2d 845, 848 (11th Cir. 1992).

To claim qualified immunity, a defendant must first show he was performing a discretionary function. *Moreno v. Turner*, 572 F. App'x 852, 855 (11th Cir. 2014). "Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." *Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009)). A plaintiff demonstrates that qualified immunity does not apply by showing "(1) the defendant violated a constitutional right, and (2) [the] right was clearly established at the time of the alleged violation." *Moreno*, 572 F. App'x at 855 (quoting *Whittier v. Kobayashi*, 581 F.3d 1304, 1308 (11th Cir. 2009)). The "clearly established" requirement may be met by one of three showings: (1) a materially similar case has already been decided; (2) an accepted general principle should control the novel facts of the case with obvious clarity; or (3) the conduct in question so obviously violated the Constitution that no prior case law is necessary. *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204–05 (11th Cir. 2012).

### 1. False Arrest

Plaintiff's Amended Complaint asserts his federal false-arrest claim against Defendant Campbell alone, arguing that Campbell "did not have probable cause to seize or arrest Plaintiff prior to shooting him" and only "assumed, without evidence,

that Plaintiff was a criminal or was engaged in criminal activity." [Doc. 54, ¶¶ 47, 50]. This claim cannot stand.

As with Plaintiff's state-law claim for false arrest, "[t]o prove a § 1983 claim for false arrest, a plaintiff must demonstrate the absence of probable cause." *Sullivan v. City of Pembroke Pines*, 161 F. App'x 906, 908 (11th Cir. 2006). "The existence or absence of probable cause can be determined as a matter of law from the facts." *Id*. If there is probable cause for the arrest, it cannot be said that Campbell violated any clearly established right in effecting the arrest, and qualified immunity would shield him from Plaintiff's claim. *See Loftus*, 690 F.3d at 1204–05; *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) (explaining that "probable cause constitutes an absolute bar to both state and § 1983 claims alleging false arrest").

The existence of probable cause depends upon whether an arrest was objectively reasonable under the totality of the circumstances. *Rankin*, 133 F.3d at 1435. This standard is met when "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995). The analysis here is almost identical to the false-arrest analysis under state law above. Again, the totality of the circumstances here—even construed in the light most favorable to Plaintiff—is that Plaintiff was wandering around a dark, closed,

ransacked gas station at 3 a.m. *See* [Doc. 64, Causey Depo, pp. 59:9-16, 70:11-15, 87:12–88:7, 91:1–94:9]. These circumstances would lead a reasonable person to believe that Plaintiff had burglarized the store or at least trespassed. Therefore, as a matter of law, the Court finds that Defendant Campbell had probable cause to arrest Plaintiff. Accordingly, the Court **DISMISSES** Plaintiff's federal false-arrest claim against Campbell (Count II).

### 2. Excessive Force

Plaintiff's Amended Complaint Plaintiff's Amended Complaint includes two separate counts asserting § 1983 excessive force in violation of Plaintiff's Fourth Amendment rights—one against Defendant Campbell alone (Count I) for shooting Plaintiff and one against all Present Defendants, including Campbell, for beating him both before and after he was handcuffed (Count V). *See* [Doc. 54, ¶¶ 38–46, 66–74]. Because the same legal standard applies, the Court will consider both counts in this section.

The touchstone of any Fourth Amendment inquiry is "objective reasonableness." *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989). And during an arrest and for the purposes of an excessive force claim, "reasonableness" must be judged from the perspective of an officer on the scene. *Id*. at 387. In addition, the Court must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of

force that is necessary in a particular situation." *Id*.

Under *Tennessee v. Garner*, a police officer can use deadly force to prevent the escape of a fleeing non-violent felony suspect only when the suspect poses an immediate threat of serious harm to police officers or others. *Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003) (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)); *Morton v. Kirkwood*, 707 F.3d 1276 (11th Cir. 2013). The Supreme Court has also noted that the *Graham v. Connor* standard of reasonableness is one of a "high level of generality," and for the plaintiff to pierce qualified immunity, the right that the officer is alleged to have violated must have been "clearly established" in a "more particularized, and hence more relevant, sense." *Brosseau v. Haugen*, 543 U.S. 194, 199–200 (2004). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*.

The Eleventh Circuit has firmly held that an officer violates the Fourth Amendment and is denied qualified immunity when he uses gratuitous force against an arrestee who is under control, not resisting, and obeying commands. *Patel v. Lanier Cnty. Georgia*, 969 F.3d 1173, 1181, 1194 (11th Cir. 2020). "Once a prisoner has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the need." *Piazza v. Jefferson Cnty.*, Alabama, 923 F.3d 947, 953 (11th Cir. 2019).

Here, like in *Patel*, the Plaintiff and Defendants "present dramatically different

versions of the events." *Id.* at 1178. Because material facts differ as to whether Plaintiff

was fleeing or charging Campbell when Campbell shot him and as to whether the

officers beat Plaintiff *after* he was subdued and handcuffed, summary judgment is not

appropriate for either Campbell or the officers who assisted in handcuffing Plaintiff. *See*

*York v. Williams*, No. 5:21-CV-01394-HNJ, 2023 WL 7927762 at *18 (N.D. Ala. Nov. 16,

2023) (denying the defendant's motion for summary judgment because there was a

genuine dispute as to the material fact of whether the defendant had beaten the plaintiff

after he was subdued). Therefore, the Court **DENIES** Defendants' Motion for Summary

Judgment [Doc. 62] with regard to Plaintiff's Fourth Amendment excessive-force claims.

Counts I and V will proceed to trial.

### 3.  Failure to Provide Prompt Medical Care

"The Due Process Clause of the Fourteenth Amendment requires government

officials to provide medical care to individuals who have been injured during

apprehension by the police." *Valderrama v. Rousseau*, 780 F.3d 1108, 1116–18 (11th Cir.

2015) (holding that a reasonable jury could conclude that two officers were deliberately

indifferent to the Plaintiff's gunshot wounds by reporting the injury as a laceration and

thus delaying the ambulance by seven minutes) (citing *City of Revere v. Mass. Gen. Hosp.*,

463 U.S. 239, 244 (1983)).

To maintain a claim for failure to provide prompt medical attention, a plaintiff

must establish (1) "the existence of an objectively serious medical need" and (2) that the

defendants were "deliberately indifferent" to that medical need. *Id*. Defendants here do not dispute that the gunshot wound was an objectively serious medical need, so the Court will focus on whether there is a genuine dispute as to whether Defendants were "deliberately indifferent" to that medical need. *See* [Doc. 62-1, p. 11].

Defendants here argue that "[t]here is no evidence in this case that any Defendant disregarded Mr. Causey's condition once they were aware of it" and that "an ambulance arrived on the scene within roughly ten minutes of Defendant Campbell first encountering Mr. Causey inside the Quick Serve." [*Id*. at p. 12]. While Plaintiff contends that it took 30 to 45 minutes more minutes after he was handcuffed for the ambulance to *arrive*, nowhere does he assert that Defendants failed to *call* the ambulance until after a delay.[24] *See* [Doc. 64, Causey Depo., pp. 65:2-8, 67:14-15, 116:19-23, 119:19-22]; *see also* [Doc. 62-5, Prestridge Depo., ¶ 11 (Prestridge testifying that he "immediately called for an ambulance" upon Plaintiff telling him he had been shot)].

Unlike in *Valderrama*, where the police officers incorrectly categorized the injury as a laceration and thus delayed the ambulance, there is no dispute of material fact here as to whether the Present Defendants personally did anything to delay the arrival of the ambulance, nor is there even an assertion that they waited any time at all before calling an ambulance upon seeing the gunshot wound. *See* 780 F.3d at 1117. In other words,

---

[24] Plaintiff also testified that he didn't know how much time and that, during the incident, he "wasn't even trying to count time." [Doc. 64, Causey Depo., p. 116:2-11].

even if there was a delay, there is no dispute as to any fact showing that any of the Present Defendants caused the delay. Therefore, the Court **DISMISSES** Plaintiff's failure-to-provide-prompt-medical-care claim (Count X).

### 4.  Section 1983 *Monell* Claim Against Sheriff Davis

Plaintiff's claim against Sheriff Davis explicitly attempts to hold him accountable for the January 25, 2015, incident—even though he wasn't there—under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). *See* [Doc. 54, p. 16 (titling Count VI as "**§ 1983 Claim Against Defendant Davis: Monell**") (emphasis in original)]; [Doc. 62-3, Davis Aff., ¶ 21]. Plaintiff's Amended Complaint does not mention whether he intends to sue Sheriff Davis in his individual or official capacity. *See generally* [Doc. 54]. As Plaintiff explicitly mentions *Monell*, the Court assumes Plaintiff meant official capacity only. *See Monell*, 436 U.S. at 690 (holding that Congress intended "municipalities and other local government units to be included among those persons to whom § 1983 applies"). However, because Plaintiff does not explicitly specify—and because Defendants argue against the claims in both his official and individual capacity—the Court will address both.

#### i.  Sheriff Davis in His Official Capacity

Defendants argue that Sheriff Davis is entitled to Eleventh Amendment immunity as to Plaintiff's claims against him in his official capacity. [Doc. 62-1, pp. 18–19]. The Eleventh Amendment to the United States Constitution bars suit in federal

court against an "arm of the state," except where such immunity is waived by the state or abrogated by Congress. *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003); *Stevens v. Gay*, 864 F.2d 113, 114 (11th Cir. 1989) ("[The] Eleventh Amendment insulates a state from suit brought by individuals in federal court unless the state either consents to suit or waives its Eleventh Amendment immunity.").

Under Georgia law, sheriffs are recognized as "arms of the state." *Powell v. Barrett*, 496 F.3d 1288, 1304 (11th Cir. 2007); *Rylee v. Chapman*, 316 F. App'x 901, 905 (11th Cir. 2009); *Wilkes v. Habersham Cnty. Comm'rs*, No. 2:10-CV-68-RWS, 2011 WL 1557913, at *2 (N.D. Ga. Apr. 25, 2011) (holding that "sheriffs are 'arms of the state' and, as such, are entitled to Eleventh Amendment immunity"). Therefore, in Georgia, sheriffs are protected from suit in federal court unless the state waived its immunity, or Congress abrogated it.

Georgia has not waived its immunity for this type of claim. *See Rooks v. Altamaha Tech. Coll.*, No. CV206-72, 2007 WL 2331830, at *2 (S.D. Ga. Aug. 13, 2007) (discussing O.C.G.A. § 50-21-23(b), which describes the limited circumstances where Georgia has waived its immunity). Instead, Georgia law expressly reserves the state's Eleventh Amendment immunity "with respect to actions brought in the courts of the United States." O.C.G.A. § 50-21-23(b); *see also Presnell v. Paulding Cnty.*, 454 F. App'x 763, 767 (11th Cir. 2011) (affirming a district court's dismissal of a § 1983 claim against an arm of the state based on Eleventh Amendment immunity). Absent a state's consent or waiver,

Congress may explicitly abrogate Eleventh Amendment immunity—*if* Congress states that intention clearly and the act must be pursuant to a valid grant of Congressional authority. *See Bd. Tr. Univ. of Ala. v. Garrett*, 531 U.S. 356, 363–64 (2001).

In the § 1983 context, Congress has not abrogated Georgia's Eleventh Amendment immunity. *Stephens v. Ga. Dep't Transp.*, 134 F. App'x 320, 324 (11th Cir. 2005) ("Congress has not abrogated immunity for claims brought pursuant to § 1983, the ADEA, or the ADA."). Therefore, "because Georgia has not voluntarily waived its immunity in § 1983 cases and Congress has not abrogated it," Sheriff Davis is entitled to Eleventh Amendment immunity on Plaintiff's § 1983 official-capacity claim against him. *Doe v. Ga. Dep't of Juv. Just.*, No. 4:18-CV-165-CDL, 2019 WL 4675375, at *3 (M.D. Ga. Sept. 25, 2019). Accordingly, Plaintiff's claims against Sheriff Davis in his official capacity are **DISMISSED**.

### ii.  *Sheriff Davis in His Individual Capacity*

"The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate [under § 1983] is extremely rigorous." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). The individual must (1) personally participate in the unconstitutional conduct, or (2) have some causal connection between their acts and the alleged constitutional deprivation. *See id.*; *Franklin v. Twiggs Cnty.*, No. 5:23-CV-00183-TES, 2023 WL 4566055, at *5–6 (M.D. Ga. July 17, 2023), *reconsideration denied*, No. 5:23-CV-00183-TES, 2023 WL 4764684 (M.D. Ga. July 26, 2023). Here, no one disputes that

Sheriff Davis did not personally participate in the events of January 25, 2015, so Plaintiff must proceed under the "causal connection" prong. *See* [Doc. 54, ¶¶ 75–83].

To establish such a causal connection, a plaintiff must show that (1) the supervisor was on notice, by history of widespread abuse, of the need to correct a practice and failed to do so, (2) a policy or custom resulted in deliberate indifference, (3) the supervisor directed a subordinate to act unconstitutionally, or (4) the supervisor knew of a subordinate's unlawful conduct and failed to stop it. *Cottone*, 326 F.3d at 1360. Plaintiff attempts to hold Sheriff Davis accountable under the second prong, alleging in his Amended Complaint that Sheriff Davis's subordinates have a custom or policy of (1) "using excessive force against anyone suspected of a crime who allegedly flees from or allegedly harms a deputy" and (2) "falsely producing charges and conspiring with each other to hide abuses against anyone suspected of a crime who allegedly flees from or allegedly harms a deputy." [Doc. 54, ¶¶ 75–76].

There is nothing in the record to indicate that Sheriff Davis had a policy of encouraging or even condoning uses of excessive force in apprehending suspects. After Defendants made this point, Plaintiff argued in Response that "[a] jury could concurrently believe the Present Defendants were following policy while also believing that Present Defendants violated Plaintiff's rights by beating him for no reason while he was defenseless, both before and after he was handcuffed and tazed." [Doc. 68, p. 18]. But Plaintiff points to no evidence in the record to support the existence of any policy of

encouraging or tolerating this kind of behavior. *See* [*id*.]. His only argument is that

conclusory statement that a jury could deduce one … apparently from thin air. *See* [*id*.].

Moreover, although the record shows that the Sheriff's Department did not have body

cameras in January 2015, there is no case law to suggest that the lack of a body cameras

is an unconstitutional policy—let alone that such a constitutional requirement was

clearly established back in 2015. *See* [Doc. 62-3, ¶ 16 (Sheriff Davis testifying that the

Sheriff's Department purchased body cameras and trained officers in the use of them in

2016)].

Likewise, there is nothing in the record to suggest that Sheriff Davis had a policy

or custom of "falsely producing charges" or "conspiring . . . to hide abuses." [Doc. 54, ¶

76]. On the contrary, the record shows, undisputably, that, in accordance with normal

practice when an officer is involved in a shooting, Sheriff Davis requested that the GBI

conduct a criminal investigation, rather allowing the Criminal Investigation Division of

his own Sheriff's Department do it internally. [Doc. 62-3, ¶¶ 6–7]. Sheriff Davis also

directed that the matter be investigated by the Internal Affairs Division of the Sheriff's

Department to determine whether Campbell violated any internal policies. [*Id*. at ¶ 8].

The Court finds that Defendants have carried their burden of showing that there is no

evidence to support Plaintiff's claims against Sheriff Davis in his individual capacity.

Accordingly, the Court **DISMISSES** Plaintiff's claims against him (Count VI) and

**TERMINATES** him as a party to this action.

5.  <u>Section 1985 Conspiracy to Deprive Rights</u>

In Count III, Plaintiff alleges that after Campbell shot Plaintiff, Prestridge "met with" Campbell and the other Present Defendants, who "had planned to, and enacted the plan, to beat Plaintiff while he was on the ground and unable to resist," and they "worked together" to beat him both before and after he was handcuffed. [Doc. 54, ¶¶ 53, 55–57]. Defendants do not attack the merits of this claim,[25] but rather solely argue that a conspiracy claim cannot be asserted against a governmental entity or its employees. [Doc. 62-1, p. 14 (citing *Dickerson v. Alachua Cnty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000))]. Indeed, the Eleventh Circuit has applied the "intracorporate conspiracy doctrine"—wherein corporate employees cannot conspire among themselves because they are agents of the corporation—to public entities. 200 F.3d at 767 (applying the doctrine to jail officers in a racial employment discrimination case); *see also Chambliss v. Foote*, 421 F. Supp. 12, 15 (E.D. La. 1976), *aff'd*, 562 F.2d 1015 (5th Cir. 1977) (applying the intracorporate conspiracy doctrine to bar a § 1985(3) claim against a

---

[25] In other words, Defendants never argued that there is no evidence in the record to support the substantive elements of a § 1985 conspiracy claim, such as a meeting-of-the-minds (i.e., an agreement) to deprive Plaintiff of his rights. *See McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) ("It is by now axiomatic that a conspiracy requires a meeting of the minds between two or more persons to accomplish a common and unlawful plan."). Nor did they argue that it was impossible or highly unlikely that multiple defendants coming from different locations, arriving at different times, got together and worked out a plan to shoot and beat Plaintiff just so they could deprive Plaintiff of his civil rights. *See* [Doc. 62-1, pp. 14–15]. They based their entire argument on the intercorporate conspiracy doctrine. *See* [*id*.]. Defendants had an opportunity to file a reply brief and explain why the *Dickerson* exceptions didn't apply, but inexplicably, they did not—even after asking for an extension of time to do so. *See* Fed. R. Civ. P. 27(a)(4). Therefore, Defendants have not shown that they are entitled to summary judgment as to Plaintiff's conspiracy claim.

public university and its officials).

But in his Response, Plaintiff points out that in *Dickerson*, the Eleventh Circuit noted that some circuits have found exceptions to this doctrine where the "agents act outside the scope of their employment, have an 'independent personal stake' in the corporate action, or engage in a series of discriminatory acts as opposed to a single action." *Dickerson*, 200 F.3d at 770; [Doc. 68, p. 20]. Citing another case (which, granted, does not involve a conspiracy claim), Plaintiff contends that Defendants' allegedly beating Plaintiff could be outside the scope of their employment if found to be "willful and wanton." [Doc. 68, p. 20 (quoting *Spradlin v. City of Owasso*, No. 12-CV-497-JED-FHM, 2014 WL 1664974, at *9 (N.D. Okla. Apr. 25, 2014)]]. Plaintiff then cites a Tenth Circuit case (which likewise does not involve a conspiracy claim), in which the court found that two police officers acted outside the scope of their employment because a jury awarded them punitive damages for beating the plaintiff in a willful and wanton manner "amounting to reckless disregard" of the plaintiff's rights. *Houston v. Reich*, 932 F.2d 883 (10th Cir. 1991); [Doc. 68, p. 20].

Although there is no Eleventh Circuit precedent directly on point on this matter, the Court is inclined to agree with Plaintiff, especially considering Defendants' choice to abandon their reply brief. If the Present Defendants acted within the scope of their employment, they acted as agents of their employer and therefore cannot be found to have conspired. *See Dickerson*, 200 F.3d at 767 (explaining that the intracorporate

conspiracy doctrine "stems from basic agency principles that attribute the acts of agents of a corporation to the corporation, so that all of their acts are considered to be those of a single legal actor") (internal citations omitted). But the Court cannot determine whether Defendants acted within the scope of their employment unless it can determine whether they beat Plaintiff before or after he was handcuffed. And that, the Court cannot do without a jury. Accordingly, Plaintiff's conspiracy claim (Count III) will proceed to trial.

### C.  Punitive Damages

Finally, at the end of Plaintiff's Amended Complaint, he requests punitive damages (Count XI). [Doc. 54, ¶ 107]. The standard for whether a § 1983 plaintiff is entitled to punitive damages is the same as under ordinary tort common law. *Smith v. Wade*, 461 U.S. 30, 46–49 (1983). A jury may be permitted to assess punitive damages in an action under § 1983 when a defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to federally protected rights of others. *Id*. at 46–47; *Benjamin v. Am. Airlines, Inc.*, 32 F. Supp. 3d 1309, 1323 (S.D. Ga. 2014). Defendants argue that "the record does not support [Plaintiff's] contention that any of the Defendants' actions were maliciously motivated or manifested any reckless or callous indifference" to Plaintiff's rights. [Doc. 62-1, p. 28]. However, as explained above, there is a dispute as to whether Defendants violated Plaintiff's Fourth Amendment right to be free from excessive force. *See supra* Section B.2.

If the jury decides that the Present Defendants gratuitously beat Plaintiff or that Campbell shot him without justification, then they would likewise be entitled to consider punitive damages. But, those questions remain for the jury to decide. *See Wade*, 461 U.S. at 46–49. Accordingly, the Court **DENIES** Plaintiff's Motion for Summary Judgment insofar as it contends Plaintiff is not entitled to punitive damages. Count XI will proceed to trial.

<u>**CONCLUSION**</u>

In sum, the Court **GRANTS** Defendants' Motion for Summary Judgment [Doc. 62] as to Plaintiff's state-law claims for negligence (Count VII); his false arrest, false imprisonment, and malicious prosecution (contained in Count IX); his § 1983 claims for false arrest against Defendant Campbell (Count II); and his claim for failure to provide prompt medical care against all Present Defendants (Count X). Additionally, the Court **GRANTS** summary judgment for Sheriff Davis, **DISMISSING** Plaintiff's *Monell* claim (Count VI), and **DIRECTS** the Clerk of Court to **TERMINATE** him as a party to this action.

However, the Court **DENIES** Defendants' Motion for Summary Judgment [Doc. 62] as to Plaintiff's state-law assault-and-battery claim (Count VIII); his state-law IIED claim (contained in Count IX); both of his § 1983 excessive-force claims (Counts I and V); his § 1985 conspiracy claim (Count III); his § 1986 duty-to-intervene claim (Count IV); and his claim for punitive damages (Count XI). The Court will shortly issue an

order requiring the parties to draft and submit a pretrial order and set the matter down for trial on a date certain in September 2024. The parties should immediately begin to prepare for trial.

**SO ORDERED**, this 17th day of July, 2024.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

44